# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
October 1, 2013 Session Heard at Murfreesboro[1]


# JUAN ALBERTO BLANCO GARCIA v. STATE OF TENNESSEE


**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Warren County**
**No. F-12960      Larry B. Stanley, Judge**

---

**No. M2012-01058-SC-R11-PC - Filed December 23, 2013**

---

In this post-conviction proceeding the petitioner alleged ineffective assistance of counsel based upon trial counsel's failure to advise him of the immigration consequences of his plea as required by Padilla v. Kentucky, 559 U.S. 356 (2010). The petitioner also alleged that his plea was involuntary and unknowing because the trial court failed to comply with Tennessee Rule of Criminal Procedure 11(b)(1)(J). The post-conviction trial court denied post-conviction relief, and the Court of Criminal Appeals affirmed. We conclude that the record fully supports the post-conviction court's findings that trial counsel advised the petitioner he would be deported upon pleading guilty and that his guilty plea could have an adverse effect upon his ability to return legally to the United States. We also agree with the Court of Criminal Appeals that the trial court's failure to comply with Rule 11(b)(1)(J) was harmless beyond a reasonable doubt because the proof shows that the petitioner was aware his guilty plea would result in his deportation and could adversely affect his ability to return legally to the United States. Accordingly, we affirm the judgment of the Court of Criminal Appeals upholding the post-conviction court's denial of post-conviction relief.


**Tenn. R. App. P. 11 Appeal by Permission;**
**Judgment of the Court of Criminal Appeals Affirmed**


CORNELIA A. CLARK, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Matt Maniatis, Nashville, Tennessee, for the appellant, Juan Alberto Blanco Garcia.

---

[1] Oral argument was heard in this case on October 1, 2013, at Middle Tennessee State University in Murfreesboro, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; James E. Gaylord, Assistant Attorney General; Lisa Zavogiannis, District Attorney General; and Thomas J. Miner, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural History

On January 14, 2011, the petitioner, Juan Alberto Blanco Garcia, was charged in a multi-count indictment with six criminal offenses—two felonies and four misdemeanors. These charges were based on events that occurred in 2008 involving a seven-year-old girl and her three-year-old brother. The petitioner, an alien unlawfully within the United States, absconded when the police began investigating the charges in 2008, and he was not apprehended until 2011. The most serious criminal charge the petitioner faced was the class B felony of aggravated sexual battery, which carried a potential prison term of eight to twelve years. The remaining five charges were for child abuse and neglect and included one class E felony, which carried a potential prison term of one to six years, and four class A misdemeanors, with potential jail terms of eleven months and twenty-nine days.[2] Counsel was appointed to represent the petitioner on the criminal charges. In the meantime, United States Immigration and Customs Enforcement ("ICE") issued an immigration detainer for the petitioner. An immigration detainer is a notice that ICE issues to a local law enforcement agency ("LEA"), which notifies "the LEA that ICE intends to assume custody of an alien in the LEA's custody once the alien is no longer subject to the LEA's detention," requests "information from an LEA about an alien's impending release so ICE may assume custody before the alien is released from the LEA's custody," and requests "that the LEA maintain custody of an alien who would otherwise be released for a period not to exceed 48 hours (excluding Saturdays, Sundays, and holidays) to provide ICE time to assume custody." http://www.ice.gov/news/library/factsheets/detainer-faqs.htm (last visited Dec. 19, 2013).

---

[2] The indictment is not included in the record on appeal, but, according to the petition for post-conviction relief, the petitioner was charged with: (1) aggravated sexual battery, a class B felony, with a Range I sentence of eight to twelve years at 100% service and a maximum fine of $25,000, see Tenn. Code Ann. § 39-13-504 (2006); id. §§ 40-35-111(b)(2), -112(a)(2), -501(i)(2)(H) (2006 & Supp. 2008); (2) child neglect of a child under the age of six years old, a class E felony, with an overall sentencing range of one to six years and a maximum fine of $3,000, id. § 39-15-401(b) (2006 & Supp. 2008); id. § 40-35-111(b)(5); (3) three counts of child abuse of a child over the age of six years old, all class A misdemeanors, id. § 39-15-401(a) (2006 & Supp. 2008); and (4) one count of child neglect of a child over the age of six years old, also a class A misdemeanor. Id. § 39-15-401(b). The four class A misdemeanor charges each carried a maximum sentence of eleven months and twenty-nine days and a maximum fine of $2,500, id. § 40-35-111(e)(1).

On August 24, 2011, the petitioner pleaded guilty to the class E felony charge of child neglect of a child under the age of six years and to one of the four class A misdemeanor charges, specifically, child abuse of a child over six years of age. The remaining four charges were dismissed. The petitioner received a six-year sentence on the class E felony conviction, with the sentence suspended to probation on the condition that the petitioner have no contact with the female victim or her adoptive family. For the class A misdemeanor conviction, the petitioner received a consecutive sentence of eleven months and twenty-nine days at 75% and was credited with the time he had served in the Warren County Jail since December 9, 2010.

At the guilty plea submission hearing, the prosecution recited the following factual basis for the plea:

> The facts in this case are that on April 8, 2008, a [seven-]year[-]old girl was found at one of the elementary schools with a note indicating that she wanted to kill herself. She was taken to the school counselor[,] and she began telling the counselor that she had been subjected to physical abuse at the home in which she resided. She was then brought to the Child Advocacy Center where she was interviewed. She stated that [the petitioner] had on occasion whipped her with a television cable cord at her residence . . . in Warren County. She lived there with her maternal grandmother and [the petitioner] was her maternal grandmother's boyfriend at that time. She had strike marks on her back and buttocks at the time she was interviewed on October 8[th] that were consistent with being whipped with the cord. She took the law enforcement officers to this home . . . and pointed out the cord which was hanging on a cabinet in the house. She also indicated that her brother[,] who was [three] years old[,] and she were residing there in a closet about 5' x 3' and that was where they slept. [She said that] [t]hey didn't have a bed or a room in the home and that [her brother] had been similarly disciplined.

> On that day efforts were made to locate [the petitioner] and discuss the matter with him. He left his residence . . . on that day and was not apprehended until two and a half years later.

Before accepting the plea, the trial court addressed the petitioner in open court, with the aid of an interpreter. In response to the trial court's questioning, the petitioner confirmed that he had reviewed the written plea agreement and waiver of rights form with trial counsel and an interpreter and stated that he understood the documents, the charges against him, the minimum and maximum sentences that would apply to each charge were he convicted, and the rights he was waiving by pleading guilty. The petitioner responded "yes" when asked

whether his guilty plea was made freely and voluntarily. The petitioner answered "no" when asked whether anyone had promised him anything or threatened him in anyway to convince him to plead guilty. Finally, when asked whether trial counsel had "tried to answer [his] questions for [him] and advise [him] about what [his] rights and options are and what may or may not happen if [he] did have a jury trial," the petitioner responded, "Yes. Each and every one." The trial court failed, however, to advise the petitioner of the immigration consequences of the plea or to inquire whether trial counsel had advised the defendant of "the immigration consequences of the plea," as required by Tennessee Rule of Criminal Procedure 11(b)(1)(J), which became effective July 1, 2011, less than two months before the petitioner's plea submission hearing.

On February 16, 2012, about six months after pleading guilty, the petitioner filed the petition for post-conviction relief from which this appeal arises. The petitioner alleged that his attorney was ineffective and his plea involuntary and unknowing because trial counsel and the trial court failed to inform him of the immigration consequences of his plea. The petitioner submitted an affidavit along with the petition, dated February 2, 2012, stating that he would "not be able to attend any hearings" on the petition because he was "incarcerated in Brooks County Detention Center in Falfarrias, Texas." The petitioner further stated that, although trial counsel "did a good job" and "helped" him "as much as she could," she "never informed [him] of a possible legal or immigration problem in the future if [he] took the deal." The petitioner stated that had he known his convictions "would bar [him] for life from applying for immigration benefits and from legalizing [himself]," he "would never have accepted their deal and would have taken it to the grand jury for trial."

At the time of the April 25, 2012 hearing on the post-conviction petition, the petitioner remained in federal custody in Texas. The record on appeal includes nothing to indicate that the petitioner sought either to attend and provide in-person testimony at the hearing or to present testimony by any other means.

However, Christa Lynn Blanco ("Mrs. Blanco"), a United States citizen and the petitioner's wife by the time of the hearing, testified on the petitioner's behalf.[3] Mrs. Blanco, who was dating the petitioner at the time of the guilty plea, remembered speaking with trial counsel on several occasions before the petitioner pleaded guilty. According to Mrs. Blanco, trial counsel was not sure whether the petitioner would be deported, stated only that the petitioner "may or may not be deported," and advised that she did not know "what

---

[3] During the plea submission hearing, the petitioner stated that his surname is Blanco rather than Garcia; during the post-conviction hearing, the petitioner's wife used Blanco as her surname; thus, we refer to the petitioner's wife as Mrs. Blanco. The date of the petitioner's marriage to Mrs. Blanco is not reflected in the record on appeal.

immigration would do other than after the trial there was a 72 hour period that ICE . . . would have to be able to pick [the petitioner] up but that [counsel] couldn't state whether they . . . would or would not." Mrs. Blanco stated that had she and the petitioner been aware the plea would render the petitioner "inadmissible into the United States, that plea would have never been accepted" and they "would have taken it to trial"; however, the post-conviction court sustained an objection to Mrs. Blanco's testimony about what the petitioner would or would not have done.

Mrs. Blanco acknowledged that the petitioner was in the United States illegally when he entered the guilty plea and that ICE had already placed a detainer on the petitioner even before the plea was entered. Mrs. Blanco also confirmed that the petitioner's illegal status alone made him subject to immediate deportation, regardless of the plea. Nonetheless, she testified that trial counsel should have informed the petitioner that the plea would render him "inadmissible" to the United States in the future.[4]

According to Mrs. Blanco, when she asked trial counsel whether [trial counsel] had discussed immigration with the petitioner, trial counsel "didn't give the specifics of what was discussed other than [to say] they discussed it." Mrs. Blanco agreed that she also consulted immigration attorneys about the effect of the plea, but they were unable to give her legal advice because she did not retain them. When pressed on cross-examination, however, Mrs. Blanco acknowledged that at least two of the immigration attorneys she consulted gave her information, which she passed along to the petitioner, to the effect that "a thing called [a] crime of moral turpitude . . . would make him inadmissible and he needed to talk to [trial counsel] about it." These immigration attorneys did not tell Mrs. Blanco which criminal offenses were considered crimes of moral turpitude.

Mrs. Blanco agreed that, at the time of the post-conviction hearing, the petitioner's detention in federal custody resulted from an immigration violation. She explained the circumstances of the violation as follows:

> We had gone to Mexico and gotten married and he was looking for places along the border to stay and mafia is horrible down there. I don't know if you guys hear stories or read the paper or hear the news in reference to it but basically he was forced back across by mafia and went past—he was set up for a diversion and he went past the first checkpoint and then he diverted himself

---

[4] The word "inadmissible" is a term of art derived from a federal statute describing "[c]lasses of aliens . . . ineligible to receive visas and ineligible to be admitted to the United States[.]" 18 U.S.C.A. § 1182(a) (West, Westlaw through 2013 Legis. Sess.).

to the second checkpoint and told them that he just wanted to go back to Mexico at that point in time and so he is being detained as an illegal re-entry.

Trial counsel, an assistant public defender, also testified at the post-conviction hearing. She explained that, because the petitioner faced imminent removal from the United States as a result of being present illegally in the United States, she was able to negotiate what was effectively a "time-served" plea agreement. Trial counsel recalled having "hours of conversation with [the petitioner] regarding the case and the possible outcomes at trial." Trial counsel had conducted the preliminary hearing, so she "knew essentially how the proof was going to play out." Because the petitioner was charged with "a very, very serious sexual offense," trial counsel advised him to accept the plea offer. She explained to the petitioner that, were he convicted of the charged offenses, he would receive a much lengthier sentence and classification as a sex offender.

Trial counsel recalled specifically advising the petitioner that he would be removed from the United States as a result of the plea, explaining "that is what happens here with just about any—in any type of situation where an illegal Hispanic is in jail. I mean for very minor offenses immigration always comes to get them after they enter their plea." Trial counsel stated that, at the time the petitioner entered the plea, he was already subject to an ICE detainer and knew that he faced immediate deportation. Trial counsel testified unequivocally that she told the petitioner "he would be deported."

Trial counsel also recalled advising the petitioner that a guilty plea could affect his ability to return legally to the United States and that he should consult an immigration attorney about this question. Trial counsel explained that her legal research indicated that "each district applie[d] the definitions [of crimes involving moral turpitude] differently[,] and so [she] did not know whether it would affect him in the future or not." According to trial counsel, the petitioner then "made it very clear to [her] that re-entry into the country legally was very, very expensive, . . . and he expressed to [trial counsel] that he didn't know if he would be able to afford to do it legally . . . ." Although trial counsel denied ever speaking with the petitioner and Mrs. Blanco together, she recalled advising Mrs. Blanco to consult an immigration attorney because she could not tell Mrs. Blanco what would "happen to [the petitioner] in the future with [the guilty plea] on his record."

At the conclusion of the hearing, the post-conviction court ruled from the bench, finding that the petitioner faced deportation, that trial counsel told him he would be deported, and that trial counsel responded appropriately to the petitioner's inquiries about whether the plea would affect his ability to return legally to the United States in the future. The post-conviction court also found that the petitioner had failed to offer any proof that having more

information about the future immigration consequences of the guilty plea would have affected his decision to plead guilty.

On May 17, 2012, the post-conviction court entered a written order, consistent with its bench ruling, finding that the petitioner was aware of the ICE detainer and knew that he would be subject to immediate deportation upon entry of the plea; that the petitioner questioned trial counsel about the effect his plea would have on his future ability to return to the United States; that the answer to this question was unclear; that trial counsel fulfilled her obligation under Padilla when she advised the petitioner that his plea could affect his ability to return legally to this country; and that the petitioner had failed to offer any proof showing that he "would have acted any differently" had he received more specific information about the future immigration consequences of the plea. The post-conviction court did not address, in either its oral ruling or final written order, the petitioner's contention that his plea was unknowing and involuntary because the trial court failed to comply strictly with Tennessee Rule of Criminal Procedure 11(b)(1)(J) when accepting his guilty plea.

The petitioner appealed, and the Court of Criminal Appeals affirmed the denial of post-conviction relief. The intermediate appellate court agreed with the post-conviction court's findings regarding the petitioner's claim of ineffective assistance of counsel. Given the testimony of trial counsel that she had informed the petitioner that he would be deported and that his plea could affect his ability to return legally to the United States, the Court of Criminal Appeals concluded that the trial court's failure to comply with Rule 11(b)(1)(J) at the guilty plea submission hearing did not render the petitioner's plea unknowing or involuntary. Garcia v. State, No. M2012-01058-CCA-R3-PC, 2012 WL 6097272 (Tenn. Crim. App. Dec. 7, 2012), perm. app. granted (Tenn. Apr. 9, 2013).

## II. Standards of Review

Under the Post-Conviction Procedure Act, relief "shall be granted when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2012). At a post-conviction hearing, the petitioner must prove factual allegations by clear and convincing evidence. Id. § -110(f). The two claims at issue in this appeal—ineffective assistance of counsel and involuntary and unknowing plea—are mixed questions of law and fact. Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011) (ineffective assistance of counsel); Ward v. State, 315 S.W.3d 461, 465 (Tenn. 2010) (voluntary and knowing plea); Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003) (voluntary and knowing plea). Mixed questions of fact and law are reviewed de novo on appeal, with a presumption of correctness given only to the post-conviction court's findings of fact. Jaco, 120 S.W.3d at 830-31. The post-conviction court's application of the law to its factual findings is

reviewed de novo, with no presumption of correctness accorded the post conviction court's conclusions of law. Smith v. State, 357 S.W.3d 322, 336 (Tenn. 2011); Calvert, 342 S.W.3d at 485; Jaco, 120 S.W.3d at 830.

### III. Analysis

#### A. Ineffective Assistance of Counsel

Article I, section 9 of the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel . . . ." Tenn. Const. art. I, § 9. Similarly, the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the [a]ssistance of [c]ounsel for his defen[s]e." U.S. Const. amend. VI. These constitutional provisions guarantee a criminal defendant the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To prevail on a claim of ineffective assistance of counsel, a petitioner must prove both that counsel's performance was deficient and that the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687; Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011). This two-part test also applies when a petitioner challenges a guilty plea based on ineffective assistance of counsel. Hill v. Lockhart, 474 U.S. 52, 58 (1985); Calvert, 342 S.W.3d at 486.

Establishing deficient performance requires showing "that counsel's representation fell below an objective standard of reasonableness," which standard is measured by "professional norms" prevailing at the time of the representation. Strickland, 466 U.S. at 688; see also Baxter, 523 S.W.2d at 932-33. Counsel's performance is not deficient if the advice given or the services rendered "are within the range of competence demanded of attorneys in criminal cases." Baxter, 523 S.W.2d at 936; see also Strickland, 466 U.S. at 687 ("[T]he proper standard for attorney performance is that of reasonably effective assistance.").

However, courts may not judge counsel's performance using "20–20 hindsight." Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Rather, every effort should be made "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Mobley v. State, 397 S.W.3d 70, 81 (Tenn. 2013); Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," Strickland, 466 U.S. at 690, and "the burden to 'show that counsel's performance was deficient' rests squarely on the [petitioner]," Burt v. Titlow, 571 U.S. __, ___, 134 S. Ct. 10, 17 (2013) (quoting Strickland, 466 U.S. at 687); see also State v. Burns,

6 S.W.3d 453, 462 (Tenn. 1999) ("[A] reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.").

The second part of an ineffective assistance of counsel claim—prejudice—requires a petitioner to prove "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; see also Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006); Goad, 938 S.W.2d at 370. When assessing whether a petitioner challenging a guilty plea based on ineffective assistance of counsel has proven prejudice, a court

> focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

Hill, 474 U.S. at 59; see also Calvert, 342 S.W.3d at 486. A petitioner must establish both deficient performance and prejudice to prevail on a claim of ineffective assistance of counsel, and a court need not address both concepts if the petitioner fails to demonstrate either one of them. Strickland, 466 U.S. at 697; Goad, 938 S.W.2d at 370.

## B. Deficient Performance

In this Court, the petitioner argues that trial counsel performed deficiently by failing to provide specific information about whether the plea would result in his deportation or bar his future legal admission into the United States. Trial counsel, the petitioner asserts, should have done more than advise that the plea could have future immigration consequences.

In response, the State contends that the record supports the post-conviction court's findings that trial counsel advised the petitioner that his plea would result in deportation because deportation was essentially an element of the plea deal.[5] The State also asserts that

---

[5] The State does not dispute that the offenses to which the petitioner pleaded guilty made him deportable. See 8 U.S.C.A. § 1227(a)(2)(E)(i) (West, Westlaw through 2013 Legis. Sess.) ("Any alien who at any time after admission is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable."). As the State points out, however, the petitioner was already subject to an ICE detainer before he pleaded guilty based on his status as an illegal

(continued...)

trial counsel was not obligated to provide the petitioner with specific information about the effect the plea would have on his future eligibility to return legally to the United States because future admissibility into this country is merely a collateral (and speculative) consequence of a guilty plea, which is categorically outside the ambit of the Sixth Amendment. Even assuming the Sixth Amendment required such advice, the State contends that trial counsel satisfied this obligation by providing the petitioner a general warning that the plea could adversely affect his ability to return legally to the United States.

Resolution of the petitioner's claim of ineffective assistance of counsel is governed largely by the United States Supreme Court's 2010 decision in Padilla v. Kentucky. In that case, the defendant, Padilla, a legal permanent resident of the United States for forty years, faced federal drug charges for transporting a large amount of marijuana in his tractor-trailer in Kentucky. Padilla, 559 U.S. at 359. Relying on his attorney's advice that he "did not have to worry about immigration status [in considering a plea to the charge] since he had been in the country so long[,]" Padilla pleaded guilty. Id. (internal quotation marks omitted). The attorney's advice proved erroneous, and Padilla's guilty plea to the drug offense made his deportation virtually mandatory. Id.

Padilla filed a petition for post-conviction relief, alleging that trial counsel failed to advise him that he could be deported as a result of his plea and had actually erroneously advised him not to worry about deportation because he had lived in the country so long. Id. The Kentucky Supreme Court denied the petition on the basis that deportation is merely a collateral consequence of a criminal conviction, id. at 359-60; thus, even erroneous advice about deportation is insufficient to support a claim of ineffective assistance of counsel, id. at 360.

The United States Supreme Court disagreed. Id. The Padilla Court acknowledged that many state and federal courts had held that defense counsel's failure to advise of the deportation consequences of a guilty plea was not cognizable as a claim of ineffective assistance of counsel because deportation was a collateral, not a direct, consequence of a criminal conviction. Id. at 365 & n.9. The Court pointed out, however, that it had never applied the distinction between collateral and direct consequences when evaluating whether counsel performed deficiently for purposes of an ineffective assistance of counsel claim. Id. at 365. The Padilla Court declined to classify deportation "as either a direct or a collateral consequence" of a criminal conviction, explaining that the distinction is "ill-suited to evaluating a Strickland claim concerning the specific risk of deportation." Id. at 366. Advice

[5](...continued)
alien.

-10-

regarding deportation, the Court explained, "is not categorically removed from the ambit of the Sixth Amendment right to counsel." Id.

Thus, the Court applied Strickland to evaluate Padilla's ineffective assistance of counsel claim, considering first whether counsel's representation fell below an objective standard of "'reasonableness under prevailing professional norms.'" Padilla, 559 U.S. at 366 (quoting Strickland, 466 U.S. at 688). After canvassing "[a]uthorities of every stripe," id. at 367, and reiterating a statement from an earlier decision recognizing that "'[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence,'" id. at 368 (quoting I.N.S. v. St. Cyr, 533 U.S. 289, 322 (2001)), the Court concluded that "[t]he weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation," Padilla, 559 U.S. at 367. The Court pointed out that in Padilla's case, the terms of the relevant immigration statute were "succinct, clear, and explicit in defining the removal consequence for Padilla's conviction." Id. at 368. "Padilla's counsel," the Court explained, "could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute, *which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses.*" Id. (emphasis added). The Court explained that Padilla's appeal was "not a hard case in which to find deficiency" because the consequences of his plea—presumptively mandatory deportation—could have easily been determined "from reading the removal statute." Id. at 368-69.

The Court cautioned, however, that "[i]mmigration law can be complex" and that there will be "numerous situations in which the deportation consequences of a particular plea are unclear or uncertain." Id. at 369. "When the law is not succinct and straightforward," the Court explained, "a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." Id.

Thus, in determining whether trial counsel performed deficiently, Padilla requires us to answer two questions: (1) whether deportation and the plea's effect on the petitioner's future eligibility to return legally to the United States were clearly defined consequences of the petitioner's guilty plea; and (2) if so, whether trial counsel properly advised the petitioner of these consequences.

With respect to deportation, the post-conviction court found that the petitioner was aware of the detainer ICE had already placed on him and knew that he would be subject to immediate deportation upon entering the guilty plea. The evidence in the record overwhelmingly supports these factual findings. Specifically, trial counsel testified that

-11-

deportation was essentially a term of the time-served plea deal the petitioner received. Trial counsel testified unequivocally that she told the petitioner he would be deported upon pleading guilty. The evidence supports the post-conviction court's finding that trial counsel advised the petitioner he would be deported upon pleading guilty.[6]

With respect to the consequences of a guilty plea for future attempts to legally immigrate to the United States, as the State points out, Padilla involved only defense counsel's obligation to advise of the deportation consequences of a guilty plea. Padilla does not address counsel's obligation to advise a client regarding the effect a guilty plea will have upon the client's future eligibility to immigrate legally to the United States. Extending Padilla as the petitioner suggests would impose a substantial burden upon defense counsel. Legal immigration depends upon many factors, which may change as a result of Congressional action, executive agency policy choices, or court decisions. Padilla neither mandates, nor even suggests, that defense counsel in a state criminal trial must be able to advise her client of the effect a guilty plea is likely to have upon the client's future eligibility to immigrate legally to the United States.

Nonetheless, even assuming for purposes of this appeal that Padilla requires defense counsel to give advice on this subject, the most that Padilla can fairly be interpreted as requiring in a situation such as this, when the law is not "succinct and straightforward," is a general warning that the plea may have adverse future immigration consequences. Id. at 369. We agree with the post-conviction court's conclusion that trial counsel satisfied this obligation. Trial counsel testified that she conducted legal research and determined that there was no clear answer to the petitioner's question about how his plea would affect his future ability to return legally to the United States.

The petitioner contends that trial counsel should have been able to determine that Tennessee's crime of child abuse would amount to a crime involving moral turpitude under the Immigration and Nationality Act ("the Act") and should have advised the petitioner that his conviction of such a crime would bar his admission to this country. See 8 U.S.C.A. § 1182(a)(2)(A)(i)(I) (West, Westlaw through 2013 Legis. Sess.).[7] The State correctly points

_____

[6] However, the record on appeal does not actually reflect that the petitioner was deported after pleading guilty. Mrs. Blanco testified at the post-conviction hearing that the couple "had gone to Mexico and gotten married" after the plea. Additionally, even assuming the petitioner was deported, the record does not indicate whether the deportation resulted from the guilty plea or from the fact that the petitioner was an alien illegally in this country against whom ICE had filed a detainer before the guilty plea was even entered.

[7] This federal statute provides:
(a) Except as otherwise provided in this chapter, aliens who are inadmissible under the
(continued...)

-12-

out, however, that a crime involving moral turpitude is nowhere defined in the Act or in the Code of Federal Regulations. Furthermore, the petitioner has provided no federal judicial or administrative decision considering whether the Tennessee offenses to which he pleaded guilty amount to crimes involving moral turpitude, although the petitioner has cited court decisions classifying abuse offenses in other jurisdictions as crimes involving moral turpitude. See, e.g., Garcia v. Att'y Gen. of U.S., 329 F.3d 1217, 1222 (11th Cir. 2003) (holding the Florida offense of aggravated child abuse amounts to a crime involving moral turpitude for purposes of the Act); Guerrero de Nodahl v. I.N.S., 407 F.2d 1405, 1406-07 (9th Cir. 1969) (holding the California offense against inflicting "upon any child any cruel or inhuman corporal punishment or injury resulting in a traumatic condition" to be a crime involving moral turpitude).

Trial counsel's testimony at the post-conviction hearing confirms the lack of legal clarity surrounding the term "crime involving moral turpitude." Trial counsel explained that the legal research she conducted before the petitioner pleaded guilty indicated that districts defined the term differently and that whether the petitioner's convictions would be viewed as crimes involving moral turpitude depended upon which district considered the question. Trial counsel testified, again unequivocally, that she told the petitioner his guilty plea might or might not have an adverse affect on his ability to return legally to the United States, that she was uncertain of the specific effect, and that he should consult an immigration lawyer for more information. Mrs. Blanco also acknowledged conveying to the petitioner the advice she obtained from two immigration lawyers that a crime involving moral turpitude could adversely affect his eligibility to return legally to the United States. Mrs. Blanco also acknowledged that neither immigration lawyer indicated specifically whether child abuse qualified as a crime involving moral turpitude, but instead recommended that the petitioner consult with trial counsel on this point.

---

[7](...continued)
following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:

. . . .

2) Criminal and related grounds
    (A) Conviction of certain crimes
    (i) In general
    Except as provided in clause (ii), any alien convicted of, or who admits
    having committed, or who admits committing acts which constitute the
    essential elements of –
    (I) a crime involving moral turpitude (other than a purely political offense)
    or an attempt or conspiracy to commit such a crime . . . is inadmissible.

The foregoing proof supports the trial court's finding that there was no clear, succinct, and straightforward answer to the petitioner's question of how the plea would affect his future eligibility to return legally to the United States. Unlike the deportation question at issue in Padilla, the question in this case regarding the petitioner's ability to return to this country legally turned upon an interpretation of a provision of the Act broadly classifying crimes. As such, we agree with the post-conviction court's conclusion that trial counsel fulfilled her obligation by advising the petitioner that the guilty plea "may carry a risk of adverse immigration consequences." Padilla, 559 U.S. at 369.

Because we have concluded that the petitioner failed to establish that trial counsel performed deficiently, the petitioner's claim of ineffective assistance of counsel must fail, and we need not and do not address the concept of prejudice.[8] We turn next to the

---

[8] Defense counsel's obligation under Padilla to advise about the deportation consequences of a guilty plea does not depend upon the defendant's legal or illegal alien status. However, courts have consistently held that an illegal alien who pleads guilty cannot establish prejudice, even if defense counsel failed to provide advice about the deportation consequences of the plea as Padilla requires, because a guilty plea does not increase the risk of deportation for such a person. See, e.g. United States v. Sinclair, 409 F. App'x 674, 675 (4th Cir. 2011) (noting that the substantial rights of the defendant, an illegal alien, were not affected because his guilty plea did not alter his deportability); Gutierrez v. United States, No. 1:10-cv-2748-JEC-RGV, No. 1:07-cr-0051-JEC-RGV-1, 2013 WL 593796, at *4 (N.D. Ga. Feb. 15, 2013) ("[I]f the defendant already knew prior to his plea that he would probably be deported after completing his prison sentence, his attorney's failure to reiterate that point could not have prejudiced him."); Cadet v. United States, No. 1:12-CV-1632-WBH, No. 1:11-CR-113-WBH, 2013 WL 504821, at *1, *2 (N.D. Ga. Feb. 8, 2013) (stating that movant had failed to convince the court that he would have rationally rejected the plea agreement if he had been fully informed of the immigration consequences of his conviction, given that he was an illegal alien prior to the arrest and the government's case against him was strong); United States v. Serrato, No. H-12-2018, No. H-11-0169, 2012 WL 2958249, at *1, (S.D. Tex. July 18, 2012) (holding that "[d]efendant's substantial rights were unaffected by counsel's alleged failure to advise because Defendant is an illegal alien and therefore his guilty plea had no bearing on his deportability"); Cadet v. United States, No. 1:12-CV-1632-WBH-LTW, 1:11-CR-113-WBH-LTW-1, 2012 WL 7061444, at *2 (N.D. Ga. May 29, 2012) (noting that the defendant could not demonstrate prejudice as the result of counsel's erroneous advice because, as an illegal alien, he was subject to deportation even if he had been acquitted after a trial or never indicted); United States v. Perea, No. 11-2218-KHV, No. 08-20160-08-KHV, 2012 WL 851185, at *1, *5 n.4 (D. Kan. Mar. 8, 2012) (overruling Defendant's claim for relief because he had not shown that, absent counsel's alleged failure to advise him that he would be deported, he would have rationally rejected the plea agreement and gone to trial, as he was in the country illegally and knew he would be subject to deportation regardless); United States v. Viera, No. 10-2594-KHV, No. 08-20106-03-KHV, 2011 WL 3420842, at *3-5 (D. Kan. Aug. 4, 2011) (finding no prejudice under circumstances where the defendant, an illegal alien: (1) never claimed that the fact of deportation was material to his decision to plead guilty; (2) stated that he intended to return to Mexico after his incarceration regardless; and (3) was unlikely to prevail at trial); United States v. Gutierrez Martinez, No. 10-2553-ADM, No. 07-91(5)-ADM/FLN, 2010 WL 5266490, at *4 (D. Minn. Dec. 17, 2010) (finding no prejudice where the defendant was an illegal alien subject to deportation prior to and

(continued...)

petitioner's claim that his guilty plea was unknowing and involuntary because the trial court failed to comply with Rule 11(b)(1)(J).

## C. Voluntary and Knowing Plea

In the landmark case of Boykin v. Alabama, 395 U.S. 238 (1969), the United States Supreme Court held that to satisfy the Due Process Clause of the United States Constitution, a guilty plea must be entered knowingly, voluntarily, and intelligently. Boykin v. Alabama, 395 U.S. 238, 242-44 (1969); State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977), superseded on other grounds by Tenn. R. Crim. P. 37(b) and Tenn. R. App. P. 3(b). The Court explained that "[a] plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment." Id. at 242. By entering a guilty plea, the defendant waives certain constitutional rights, including the privilege against self-incrimination, the right to a jury trial, and the right to confront the witnesses. Boykin, 395 U.S. at 243; Mackey, 553 S.W.2d at 339-40. "For this waiver to be valid under the Due Process Clause, it must be an intentional relinquishment or abandonment of a known right or privilege." Boykin, 395 U.S. at 243, n.5 (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)) (internal quotation marks omitted). Given the loss of liberty or life at stake when a defendant pleads guilty, a trial judge must ensure that the waiver is valid by

> canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence. When the judge discharges that function, he leaves a record adequate for any review that may be later sought and forestalls the spin-off of collateral proceedings that seek to probe murky memories.

---

[8](...continued) after the guilty plea); Ibarra v. State, No. 4D11-1459, 2013 WL 1136413, at *1 (Fla. Dist. Ct. App. Mar. 20, 2013) (affirming that, as an illegal alien, the defendant had no legitimate expectation that he could have remained in the country when he entered his plea and could have no claim for relief based upon his reliance on counsel's purportedly inaccurate advice regarding the immigration consequences of his plea); Joseph v. State, 107 So.3d 492 (Fla. Dist. Ct. App. 2013) ("Padilla applies only to those who were present in the country lawfully at the time of the plea."); see also César Cuauhtémoc García Hernández, Padilla v. Kentucky's Inapplicability to Undocumented and Non-Immigrant Visitors, 39 Rutgers L. Rec. 47, 52 (2012) (observing that even if courts applied Padilla to undocumented persons, courts likely would deny claims of ineffective assistance of counsel on the grounds that any incompetent advice regarding the deportation consequences of a criminal conviction would be harmless because the individual would be deported regardless of the conviction).

Boykin, 395 U.S. at 243-44 (citations omitted). Although waiver of these constitutional rights will not be presumed from a silent record, id. at 243, "'Boykin does not require separate enumeration of each right waived and separate waivers as to each [of the three rights].'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Fontaine v. United States, 526 F.2d 514, 516 (6th Cir. 1975)).

> [A] plea of guilty by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

Brady v. United States, 397 U.S. 742, 755 (1970) (quoting Shelton v. United States, 242 F.2d 101, 115 (5th Cir. 1957)). As the Boykin Court put it, a plea is not "voluntary" if it is the product of "[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats." Boykin, 395 U.S. at 242-43. The standard is "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" Jaco, 120 S.W.3d at 831 (quoting North Carolina v. Alford, 400 U.S. 25, 31 (1970)).

In addition to the procedure Boykin requires to ensure a knowing and voluntary waiver of constitutional rights, eight years after Boykin, this Court exercised its "supervisory power," Mackey, 553 S.W.2d at 340-41, and adopted additional safeguards, "as a matter of state law, in order better to assure that such pleas are entered voluntarily and intelligently." Blankenship, 858 S.W.2d at 903. Rule 11 of the Tennessee Rules of Criminal Procedure was promulgated one year after Mackey, in 1978, and prescribes "the approved procedure for accepting guilty pleas in the trial courts of this [S]tate." Blankenship, 858 S.W.2d at 903.

Unlike the three constitutional rights identified in Boykin, the additional processes for accepting a guilty plea that Mackey and Rule 11 require are not necessarily constitutionally based. See Ward v. State, 315 S.W.3d at 466-67 (recognizing that "[c]ourts are constitutionally required to notify defendants of only the direct consequences—not the collateral consequences—of a guilty plea" and holding that the sex offender registry requirement is a collateral consequence while the lifetime community supervision requirement for sexual offenders is a direct consequence); Howell v. State, 185 S.W.3d 319, 331 (Tenn. 2006); Jaco, 120 S.W.3d at 831; State v. Prince, 781 S.W.2d 846, 853 (Tenn. 1989) ("Mackey mandated advice by the trial judge about the consequences of a guilty plea that went beyond the requirements of Boykin. . . . That advice and any other requirement of Mackey in excess of Boykin is not based upon any constitutional provision, federal or

-16-

state."). As such, an allegation that a trial court failed to follow either the Mackey procedure or Rule 11 does not necessarily establish a cognizable post-conviction claim because post-conviction relief is only available to remedy an abridgement of a state or federal constitutional right. Tenn. Code Ann. § 40-30-103; Johnson v. State, 834 S.W.2d 922, 925 (Tenn. 1992) ("Whether the additional requirements of Mackey were met is not a constitutional issue and cannot be asserted collaterally."); Rigger v. State, 341 S.W.3d 299, 308 (Tenn. Crim. App. 2010) (recognizing that the procedures embodied in Rule 11 and Mackey are not constitutionally based and stating that "the claim of a lack of information about these rights is not, apart from a claim of involuntary and unknowing guilty plea, per se cognizable in a post-conviction proceeding").

In this case, the petitioner has not alleged that the trial court failed to inform him of the three constitutional rights at issue in Boykin. Rather, the petitioner alleges that the trial court failed to comply with Tennessee Rule of Criminal Procedure 11(b)(1)(J), which provides:

> Before accepting a guilty or nolo contendere plea, the court shall address the defendant personally in open court and inform the defendant of, and determine that he or she understands, the following:
>
> . . . .
>
> if the defendant pleads guilty or nolo contendere, it may have an effect upon the defendant's immigration or naturalization status, and, if the defendant is represented by counsel, the court shall determine that the defendant has been advised by counsel of the immigration consequences of a plea.

Tenn. R. Crim. P. 11(b)(1)(J).

The State agrees that the trial court failed to comply with Rule 11(b)(1)(J); however, the State asserts that the trial court's noncompliance amounted, at most, to harmless non-constitutional error. See Lane v. State, 316 S.W.3d 555, 565 (Tenn. 2010) (discussing the differences between constitutional and non-constitutional harmless error analysis). The State contends that "[c]ourts are constitutionally required to notify defendants of only the direct consequences–not the collateral consequences–of a guilty plea," Ward v. State, 315 S.W.3d at 467 (citing Brady, 397 U.S. at 755.), that the immigration consequences of a guilty plea are collateral for purposes of the Due Process Clause, and that Padilla, which addressed only the obligations of defense counsel under the Sixth Amendment, did not abrogate this rule. Alternatively, the State argues that the error is harmless, even if it is evaluated by the more

-17-

stringent constitutional standard, which imposes upon the State the burden of establishing that the error is harmless beyond a reasonable doubt.

In Lane, this Court discussed the harmless error analysis that applies when evaluating the effect of a trial court's erroneous failure to comply with Rule 11. 316 S.W.3d at 564-65. We explained that the level of harmless error review depends upon whether an omission from the Rule 11 advice litany amounts to non-constitutional or constitutional error. Id. at 565. If the omission involves advice that is not constitutionally required, a court inquires whether the error was prejudicial. Id. On the other hand, if the omission amounts to constitutional error, a court must determine whether the State has established that the error was harmless beyond a reasonable doubt. Id.

Although the State is correct in its assertion that several courts have refused to interpret Padilla as imposing a Due Process obligation on trial courts to inform defendants of the immigration consequences of guilty pleas,[9] this Court resolves constitutional issues only when doing so is necessary to decide a case. In re Taylor B.W., 397 S.W.3d 105, 114 (Tenn. 2013); State v. Taylor, 70 S.W. 3d 717, 720 (Tenn. 2002). This appeal does not require us to resolve this constitutional issue. Here, even assuming the trial court's failure to advise about the immigration consequences of the plea in compliance with Rule 11(b)(1)(J) amounted to constitutional error, we conclude that the State has met its burden of establishing that the error is harmless beyond a reasonable doubt.

Here, trial counsel testified unequivocally that she advised the petitioner he would be deported upon pleading guilty and that his guilty plea could have an effect upon his future

---

[9] See, e.g., United States v. Rodriguez-Penton, No. 13-5349, 2013 WL 6231773, at *2-3 (6th Cir. Dec. 3, 2013) (holding that Padilla describes defense counsel's obligations and does not involve a district judge's obligation to ensure a plea's validity under the Due Process Clause); United States v. Rodriguez–Gonzales, No. 12–3735, 2013 WL 5911768, at *2 (6th Cir. Nov. 4, 2013) (same); United States v. Delgado-Ramos, 635 F.3d 1237, 1240-41 (9th Cir. 2011) ("While Padilla's holding is directly applicable to our Sixth Amendment analysis in [United States v.] Fry, it sheds no light on the obligations a district court may have under Rule 11 and [D]ue [P]rocess."); State v. Ortiz, 44 A.3d 425, 431 (N.H. 2012) ("[C]onstitutional due process protections do not require trial courts to advise defendants of such potential [immigration] consequences during plea colloquies."); State v. Salazar, No. 2 CA-CR 2010-0296-PR, 2011 WL 285554, at *2 (Ariz. Ct. App. Jan. 19, 2011) (holding that Padilla did not hold that Due Process requires trial courts to warn defendants about the immigration consequences of pleas); see also United States v. Nicholson, 676 F.3d 376, 381-82 n. 3 (4th Cir. 2012) (noting the position of the Advisory Committee on the federal rules of criminal procedure that "Padilla was based solely on the constitutional duty of defense counsel, and does not speak to the duty of judges") (citing Report of the Advisory Committee on Criminal Rules (Dec. 8, 2010)). But see People v. Peque, __ N.E.2d__, __, 2013 WL 6062172 (N.Y. 2013) (stating that the risk of deportation "must be mentioned by the trial court to a defendant as a matter of fundamental fairness").

eligibility to return legally to the United States. The post-conviction court accredited trial counsel's testimony. Additionally, Mrs. Blanco's testimony concerning the information she received from immigration lawyers and passed on to the petitioner before he pleaded guilty corroborates trial counsel's testimony that she advised the petitioner to consult immigration lawyers about this question and also indicates that the petitioner was aware his plea could have an adverse impact upon his ability to return legally to the United States.[10] Because the proof in the record establishes beyond a reasonable doubt that the petitioner "already knew what he was not advised . . . the harmless nature of the error is classic." State v. Neal, 810 S.W.2d 131, 139 (Tenn. 1991), overruled in part on other grounds by Blankenship, 858 S.W.2d at 902. Thus, even assuming, for purposes of this appeal only, that the trial court's failure to comply with Rule 11(b)(1)(J) amounted to constitutional error, the State has met its burden of establishing that the error was harmless beyond a reasonable doubt and did not preclude the petitioner from entering a knowing and voluntary guilty plea.[11]

## IV. Conclusion

Because trial counsel did not perform deficiently and the trial court's failure to comply with Rule 11(b)(1)(J) was harmless beyond a reasonable doubt, we affirm the judgment of the Court of Criminal Appeals upholding the trial court's denial of the petition for post-conviction relief alleging ineffective assistance of counsel and an unknowing and involuntary guilty plea. Costs of this appeal are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE

---

[10] Although we have assumed for purposes of this appeal that the petitioner's guilty plea alone prevents him from returning to the United States legally, as noted earlier, this assumption is not at all clear from the record on appeal. Mrs. Blanco testified that the petitioner was in federal custody because he was apprehended upon attempting to return illegally to this country. If the petitioner was deported initially for residing in the United States illegally, his apprehension upon attempting to re-enter the United States illegally would automatically bar him for ten years from returning to this country, regardless of his guilty plea. See 8 U.S.C. A. § 1182(a)(9)(A)(ii). If the petitioner was not deported and voluntarily returned to Mexico for his marriage, he would likewise be inadmissible to the United States for ten years, regardless of his guilty plea, because he had resided illegally in the United States for more than one year. Id. § 1182(a)(9)(B)(i)(II). Although the record on appeal is not entirely clear, it appears the petitioner would have been inadmissible to this country for ten years, regardless of his guilty plea.

[11] Despite our conclusion that the error is harmless, we encourage trial judges to comply scrupulously with Rule 11 when accepting guilty pleas.